OPPERMAN COAL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 3317, 14729, 15792. Promulgated May 4, 1927.

1. Value of a leasehold of coal lands determined for purposes of invested capital and exhaustion.

2. Deductions for exhaustion of the value of a leasehold, acquired by way of paid-in surplus, should be allowed at reasonable rates and considered in the computation of the tax liability.

*Charles D. Hamel, Esq., Lee I. Park, Esq.,* and *J. E. Campbell, Esq.,* for the petitioner.

*M. E. McDowell, Esq.,* for the respondent.

These are proceedings for the redetermination of deficiencies in income and profits taxes as follows: For the calendar year 1917, in the amount of $13,190.10 (Docket No. 3317); for the calendar years 1918 and 1919 in the respective amounts of $563.26 and $1,373.42 (Docket No. 15792); and for the calendar year 1920 in the amount of $17,689.70; also a deficiency in income tax for the calendar year 1923 in the amount of $736.99 (Docket No. 14729).

The only question at issue under the pleadings and record herein is the value for purposes of invested capital and exhaustion, of a certain leasehold of coal lands as of April 28, 1913, the date of acquisition by petitioner.

### FINDINGS OF FACT.

Petitioner is a corporation organized under the laws of West Virginia, with its principal office at Blair. It had a capital stock of $50,000, divided into 500 shares of a par value of $100 each. Practically all of the stock of petitioner was owned by Thos. E. Richards and J. H. Opperman, except necessary qualifying shares, which stock was later transferred to members of the Richards and Opperman families. Petitioner was organized on or about March 20, 1913, for the sole purpose of taking over and operating a certain leasehold of coal lands theretofore obtained by Thos. E. Richards on December 28, 1911, from the Boone County Coal Corporation, a West Virginia corporation. In obtaining the lease contract in question Richards was acting jointly for himself and his father-in-law, J. H. Opperman. The lease contract contained, *inter alia,* provisions to the following effect:

(1) For the consideration of the sum of $1 and the performance of the terms and conditions of said contract, the lessor granted to the lessee the exclusive right to mine coal and manufacture coke from such veins or seams of coal as might be found above water level

upon or under a certain tract of land, described by metes and bounds, situated on the waters of Spruce Fork of Little Coal River, in Boone County, West Virginia, containing approximately 1,000 acres.

(2) The term of the lease was for a period of 28 years from its date, or until the first day of January, 1940, with the privilege of renewal for a further period of 10 or 20 years, upon the same terms and conditions, except that the rent or royalty reserved by the lessor during the renewal period should be mutually agreed upon by the parties before the expiration of the original term.

(3) The lessee was required to commence mining operations upon the leased premises within 60 days after railroad connections were made to the property.

(4) The following rents and royalties were required to be paid by the lessee to the lessor: 8 cents per ton of 2,000 pounds of coal run of mine, carried away from or used upon the premises during the term of the lease, to be paid monthly on the twenty-fifth day of each calendar month for the calendar month immediately preceding, with a minimum rental or royalty to be paid as follows:

For the first year after railroad is built to connect property, the actual amount of coal mined shall be paid for at the rate of 8¢ per ton above mentioned. The second year the amount of coal mined on the above basis, with the understanding it shall be at least one-half of the minimum tonnage requirements, which shall after the second year be computed as follows: For each acre of lease a minimum output of 100 tons of coal per year * * *.

(5) In connection with the payment of the minimum royalty required, the contract contained the following stipulation:

It is, however, understood and agreed upon, that in the event of said lessee failing to mine an amount of coal equivalent, at the royalties aforesaid, to said minimum rent, that the said lessee shall have the right and privilege of mining the amount of shortage, which the minimum as above provided for is in excess of the amount of coal actually mined at any time within a period of five years next thereafter; thus reimbursing said lessee for such deficiency.

(6) Taxes upon the leased premises were to be paid as follows:

That the said lessee will promptly pay at the several times they become due all taxes, levies and assessments upon all improvements put by them upon the demised premises and upon the estate hereby created, however such levies and taxes may be assessed; all taxes against the fee in the real estate herein demised shall be paid by the lessor.

(7) The lessor agreed to erect an electric plant, centrally located, from which electric power should be sold to the lessee at a price to be agreed upon, which should not be more than 2½ cents per kilowatt hour of direct current as measured by an approved meter to be supplied by the lessor.

(8) The lessor agreed to construct or cause to be constructed a railroad to connect the then present branch of the Chesapeake &

Ohio Railway Co. with the siding of the lessee at its mine or mines; the said railroad to be begun and pushed as rapidly as possible to completion, but said completion was to be attained within a period of twelve months next after the date of said lease contract.

By an instrument of writing dated April 28, 1913, Thos. E. Richards, joined by his wife, assigned and transferred said lease contract to the Opperman Coal Co., petitioner herein. The deed of assignment recited a consideration of " Five Dollars ($5 00) and other valuable considerations," and contained a clause, executed by the Boone County Coal Corporation, whereby said lessor released and discharged Richards individually from further liability under said contract, and consented to the assignment and transfer of said lease to the said Opperman Coal Co. By resolution dated March 21, 1913, the stockholders of petitioner authorized the board of directors to issue and deliver to Thos. E. Richards 53 shares of the capital stock of the corporation, having a par value of $5,300, or $100 per share, in exchange for the lease contract, which was thereafter transferred to the corporation under date of April 28, 1913. However, it was not intended that the 53 shares of stock issued to Richards should represent the value of the lease contract transferred to petitioner, but said stock was given to Richards for the purpose of reimbursing him and Opperman for money theretofore expended upon the leased property by way of preliminary development work.

At the time the leasehold was acquired by Richards on December 28, 1911, practically no development work had been done on the property. Some openings had been made around the boundaries, which indicated that the property was underlaid with coal, but neither the quantity nor quality of the coal was definitely known. At that time the railroad had not been completed to the property but was then about four miles away. The railroad was completed to the leased premises about the first of March 1913.

In December, 1911, there was no property in the immediate vicinity of the Opperman lease which had been developed. The nearest developed properties were about three or four miles to the east and possibly two miles to the west.

Between the date of the acquisition of the lease by Richards in December, 1911, and the date of its transfer to petitioner in April, 1913, certain development work had been done by Richards and Opperman. A tipple had been constructed, houses had been built for employees, drillholes put down, and entries driven into the coal at various points, some of the tunnels extending as far as 300 feet. Also, railroad connections to the property had been completed and sidetracks constructed. This development work demonstrated the quantity and quality of the coal and the character of the roof in the tunnels. It also disclosed that the leased property contained above

drainage three seams of minable coal, that is, seams of a thickness and containing coal of a purity to make them marketable and merchantable. The three seams disclosed were as follows: commencing at the top of the hill, the first was the No. 5 Block Seam, averaging about 126 inches in thickness, which contained coal adaptable for steam and domestic purposes; the second was the Coalburg Seam, averaging 66 inches and containing coal of a good quality adaptable for steam and domestic purposes, with a possible use of the slack for by-product purposes or to produce gas; the third and last, the Chilton Seam which came out at about tipple height, averaging approximately 84 inches, contained coal of excellent quality, being low in ash and sulphur and high in heat units, making an excellent coal for domestic purposes, for steam purposes, and also for by-product purposes. In general, the slate conditions were good; there was very little slate in the coal.

The total recoverable quantity of coal in all three seams was estimated at nineteen to twenty million tons, which, upon the basis of an annual production of 250,000 tons, was sufficient to last beyond the life of the lease. The water conditions in the Opperman mine were good; there was very little water, most of it draining out naturally.

The prevailing royalty rate in West Virginia, on coal mines comparable to the Opperman property, beginning in 1913 and continuing to 1916, was 13 cents per ton. Taxes on mining property in this field averaged about 5 cents per ton, including the improvements and fee, one-half, or 2½ cents per ton being applicable to the improvements and the same amount being applicable to the fee. It was not customary for the lessor to pay the taxes on the fee.

The customary recovery period on minimum royalty was two years, and in some leases it was only one year, while a recovery period of five years was unusual. A long recovery period is desirable from the standpoint of the lessee, as it enables him to recover back the royalty paid in case the minimum amount of coal is not mined in any one year. The Opperman mine was equipped for a production of about 250,000 tons per year, or about 1,200 tons per day. The average profit of the producing coal companies in the field in which the mine of taxpayer is situated, was 30 cents per ton for the ten-year period preceding the year 1913.

A lease known as the " Spruce Bend Lease," in the immediate vicinity of the Opperman lease was sold to the Boone County Coal Corporation in 1915 for $250,000. An offer of $750,000 was made for petitioner's lease in October, 1920. Based upon an average annual output of 250,000 tons of coal, the value of the power clause to the lessee under the lease contract herein as of April, 1913, was $35,600.

The actual cash value of petitioner's leasehold on April 28, 1913, was $200,000. On January 1, 1914, its value was the same as on April 28, 1913, less exhaustion sustained for the intervening period.

OPINION.

TRAMMELL: Petitioner avers that the value of its leasehold of coal lands as of April 28, 1913, the date of acquisition, was over $200,000 and that such valuation should be used as the basis for invested capital purposes in 1918 and subsequent years. Petitioner further asserts that the value of the leasehold on January 1, 1914, was the same as on April 28, 1913, less adjustment for exhaustion during the intervening period, and that such adjusted valuation should be used for invested capital purposes in 1917. Also, that it is entitled to an exhaustion allowance for each of the years involved herein upon the basis of a valuation of $200,000 as of April 28, 1913. Respondent allowed a valuation for the lease as of April 28, 1913, of $5,300, for all purposes, and denies that it had a greater value. It is apparent, therefore, that the only issue raised for determination here is the value of the leasehold as of the basic date, both for purposes of invested capital and exhaustion.

In the case of tangible property, such as a leasehold, acquired by a corporation in exchange for stock if the value thereof is clearly and substantially in excess of the par value of the stock exchanged, such excess may be treated as paid-in surplus in the computation of invested capital. *Appeal of St. Louis Screw Co.*, 2 B. T. A. 649; *Appeal of Henderson Overland Co.*, 4 B. T. A. 1088.

From a careful consideration of the evidence in the record before us, we can not escape the conclusion that the value of the leasehold of petitioner on April 28, 1913, was clearly and substantially in excess of the sum of $5,300, the value allowed by respondent and which represented the par value of the stock exchanged therefor. This conclusion is supported by the testimony of two disinterested expert witnesses, who appear to have been peculiarly and eminently qualified to testify with respect to the value of the leasehold in question, and is corroborated by other well established and uncontroverted facts.

Krebs, a witness for the petitioner, testified that he was a mining engineer and geologist, having practiced his profession for over thirty-two years, principally in West Virginia; that he had had extended experience in the development of mining properties, such as coal, oil, and gas, and particularly in the valuation of such properties for prospective buyers, for bondholders, and parties wishing to issue bonds; that from 1921 to 1923, he was consulting engineer to the State Tax Commissioner of West Virginia in making valuations of coal properties in that State for taxation purposes. He

has known of the activities of petitioner since it began operations in West Virginia, and has been familiar with the property covered by petitioner's lease since about 1909. He testified in substance that, in his opinion, petitioner's leasehold had a value, as of April, 1913, of $231,255, and a value as of January 1, 1914, of $217,615. This did not take into consideration the value of the electric power clause, amounting to $35,600. He further testified that, upon his estimate of the value, he recommended to a client the purchase of this property in 1920 for $750,000, and that his client thereafter made such an offer of purchase.

Taylor, a witness for the petitioner, testified that he was a consulting engineer and operator of mines, and was a graduate of the University of Pittsburgh, with degrees of Civil Engineer and Doctor of Science. Since 1887, he has been engaged, among other things, in the development and operation of mines, coke ovens and coking plants, principally in Pennsylvania, Ohio, and West Virginia. He has made many valuations of mining properties for prospective buyers and for other parties. He was familiar with petitioner's property, and made a valuation of the leasehold as of April, 1913. Using a basis of computation entirely different from that of the witness Krebs, Taylor reached substantially the same conclusion as to its value.

The evidence also established the fact that the Spruce Bend Lease, in close proximity to petitioner's property, was sold in 1915 for $250,000. At that time the prevailing royalty rate was the same as at the beginning of 1913. This property contained less acreage than that of petitioner, and the mining conditions were not as favorable. Other corroborative facts, of more or less minor importance, are disclosed by the record, such as the large quantity and excellent quality of coal contained in the property leased to petitioner, the location and advantageous mining conditions and timber rights, which it is not necessary to discuss in detail here.

From all the evidence of record, it is our opinion that the leasehold of petitioner had an actual cash value of $200,000, on April 28, 1913, as claimed by the petitioner, and that the value of this leasehold in excess of the par value of the stock exchanged therefor, should be deemed to be paid-in surplus. Such valuation should, therefore, be reflected in the computation of invested capital of petitioner for all of the years involved.

Deductions for exhaustion of the value of the leasehold acquired by way of paid-in surplus, should be allowed at reasonable rates and considered in the computation of the tax liability of petitioner. *Appeal of Steinbach Co.*, 3 B. T. A. 348. See also *Appeal of Hotel DeFrance Co.*, 1 B. T. A. 28; *Appeal of Farmers Grain Co.*, 1 B. T. A. 605.

The value of the lease should be spread over the unexpired life or term thereof, computed from the date of acquisition, which is 26⅔ years.

While this proceeding purports to include the years 1921 and 1922, it appears that no deficiency has been determined by respondent for either of said years, and that the Board has no jurisdiction in respect thereof. *Appeal of Cornelius Cotton Mills*, 4 B. T. A. 255. The appeals for the years 1921 and 1922 are hereby dismissed.

> *Judgment will be entered on 15 days' notice, under Rule 50.*